## Snyder, et al. v. Hudson, et al.

(Decided February 7, 1928.)

## Appeal from Franklin Circuit Court.

1. Wills.—Evidence in will contest held sufficient to take case to jury on question whether aged and infirm testator had testamentary capacity.

2. Appeal and Error.—Where proponents in will contest had requested certain instructions, which were refused, submitting issue of undue influence to jury, they could not complain on appeal of instructions similar to the ones requested because they submitted that issue to the jury.

3. Trial.—Argumentative instructions in will contest held properly refused although conclusions of law therein were stated correctly.

4. Wills.—In view of Ky. Stats., sec. 4850, providing that the same effect shall be given to a jury's verdict in a will case as is given to verdict of jury in other civil cases, verdict finding paper not to be will is conclusive on appeal unless palpably against evidence.

5. Wills.—On appeal from judgment on verdict in will contest finding paper not to be will, credibility of witnesses held for jury.

H. M. COLLINS, WILEY MARSHALL and GUY H. BRIGGS for appellants.

POLK SOUTH, JR., and L. W. MORRIS for appellees.

Opinion of the Court by Commissioner Hobson—
Affirming.

J. B. Hudson died in Franklin county in the fall of
1926 leaving a will which was duly probated in the county
court. Some of the heirs prosecuted an appeal to the
circuit court and on trial there the jury found the paper
in contest not to be his will. The propounders appeal.

The chief grounds for reversal are that there was
not sufficient evidence of incapacity or undue influence to
warrant the submission of the case to the jury, and that
the verdict is against the evidence. The facts are these:

J. B. Hudson was about 80 years of age. He had
no descendants; he had an estate of about $40,000 at the
time the will was made. He lived in Arkansas for many
years, but about 10 years ago he returned to Kentucky.
He deposited his money with the State National Bank,
and lived for several years with his brother, F. M. Hud-
son. He then bought a house and lot in Paris, where he
lived with Harvey Ewald and wife under an arrangement
that they should board him for the use of the house.
Ewald and wife moved out of the house in August, 1925,
and he then lived there by himself until in January, 1926.
L. D. Jones, the cashier of the State National Bank, had
occasion in December, 1925, to be in Paris and while
there went to see Hudson. He found him sick and un-
able properly to take care of himself and invited Hudson
to come to Frankfort with him. Hudson declined but
Jones at once saw a nephew of Hudson and told him
of his uncle's condition and that the family ought to go
and take care of him. The nephew said that he was so
fixed at home that he could not do so, but he went to see
Mrs. Minnie Snyder, who was a niece and lived in Frank-
fort, and Mrs. Snyder, on learning the condition,
promptly went up to Paris and brought her uncle to her
house and took care of him until he died. A few days
after he came to her house the will was written.

Mr. Jones when in Paris suggested to Hudson that
he should make a will, and Hudson said he would think
about it. Nothing more took place between them until
a few days after Hudson came to Frankfort. Charles
Snyder went down to the bank and told Mr. Jones that
Hudson wished to see him. Jones went up to see him
and he there told Jones that he had concluded to make a
will and leave his property to his nieces. He asked Jones

to prepare the will. Jones did so, and after it was prepared it was duly executed. He told Jones that the men had plenty and he wished to leave his property to his nieces, not equally but so that the nieces would receive their parent's share; that is, where there was more than one niece in the family, the share going to that family would be divided between them. The contestants proved that one niece was omitted from the will, but the contestees showed that this person was unknown to the Kentucky family and that her father had declared that she was not his child. The contestants proved that some five or six years before his death J. B. Hudson became very sick and was operated on. The doctors concluded he had cancer and would live but a short time; but to their surprise he got well. However, after this he was not as strong as before. A shed fell upon him, and the proof by a number of witnesses who knew him well was to the effect that after this shed fell upon him he was never himself again and not competent to do any business. E. J. Ewald and wife, with whom he lived until August, 1925, testify that while he was living with them he was a physical and mental wreck; that he did not know what he was doing or what he had done; that they had to watch him like a child; that he would go around and turn on the water or gas and leave it on, and was simply a childish old man without mind. They did not see him after August, 1925, but the other witnesses all testify that he was steadily getting worse from the time that the shed fell upon him until he died, and two of his brothers, who saw him after he came to Mrs. Snyder's, testify he was in the same condition when they saw him there. The testimony of the Ewalds is confirmed by Curtis Henry, a merchant in Paris with whom Hudson dealt and who knew him well. These witnesses say that he suffered from dropsy, his legs were very much swollen, and he was practically without mind. A number of other witnesses state facts tending to confirm the above.

This evidence was clearly sufficient to take the case to the jury on the question of mental incapacity. The evidence as to undue influence is not so satisfactory. One witness testifies that she heard Mrs. Snyder ask her uncle in 1925 to give her his money in bank and his bonds, and he refused to do so. Mrs. Snyder denies that this occurred. In August, 1925, he made to Snyder and wife a

deed to the house and lot in Paris, which was of value $7,000, without any consideration. After he came to their house and while he was living there he gave Mrs. Snyder a check for $545, which she says was a gift. He also gave to her husband a check for $400, which she says was for repairs on the house in Paris. But it was their house under the deed. In addition to this, the brothers testify that when they came to see their brother she would sit right by and not allow them to have any private talk with him. There is no direct proof that she had anything to do with the will, except that she was in and out of the room while it was discussed, but she gets under the will more than some of the other nieces, because she is an only daughter.

At the conclusion of the evidence appellants moved the court to instruct the jury as contained in instructions (a), (b), and (c). The court refused to give instructions (a), (b), and (c), but gave instructions 1, 2, and 3. Appellants excepted to instructions 1 and 2, but instructions 1 and 2 are practically the same as instructions (a) and (b), which they asked. They cannot complain here that the instruction was given which they asked. These instructions submitted to the jury the question whether the paper was procured by undue influence or at a time when the testator was not of sound mind. Appellants cannot therefore complain in this court that the question of undue influence was submitted to the jury. Instructions, 1, 2, and 3, given by the court, are the whole law of the case as has often been held by this court. Instructions (d), (e), and (f), were properly refused. They are simply argumentative, and, while correct conclusions of law are stated, such instructions have not been approved by this court.

The evidence for the will was to the effect that the testator was entirely himself when he made the will and that his mind was good, and showed him to be a very different person from that shown by the evidence for the contestants. While the weight of the evidence is in favor of the will, this was a question for the jury. Section 4850, Kentucky Statutes, provides:

> "An appeal may be taken from the county court to the circuit court of the same county, and thence to the Court of Appeals, from every judgment admitting a will to record or rejecting it. The circuit court

shall try both law and fact unless a jury be required. The Court of Appeals shall not hear any matter of fact pertaining thereto, other than such as may be certified from the circuit court; and the same effect shall be given to the verdict of a jury in a will case as is given to the verdict of a jury in other civil cases.''

This statute changed the former rule. For many years the statute gave the Court of Appeals the right to determine finally whether a will should be probated or not. But under the present statute the verdict of the jury in a will case must be given the same effect as the verdict of a jury in other civil cases. In other civil cases the verdict of the jury will not be disturbed in this court unless it it palpably against the evidence. The court is unable to say here that the verdict is palpably against the evidence. The credibility of the witnesses was for the jury. The case turned in the end on the credibility of the witnesses. This court cannot disturb the verdict of the jury simply on the credibility of the witnesses.

There was no material error in the admission or rejection of evidence to which exception was taken by appellants, and on the whole case the court finds no substantial error to their prejudice.

Judgment affirmed.